IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 16, 2024 Session

**STATE OF TENNESSEE v. COREY DENZAL WILLIAMS**

**Appeal from the Criminal Court for Sumner County**
**No. 2018-CR-745   Dee David Gay, Judge**
_____

**No. M2023-01070-CCA-R3-CD**
_____

A Sumner County jury convicted the defendant, Corey Denzal Williams, of first-degree murder, reckless endangerment, aggravated assault, and false imprisonment, for which he received an effective sentence of life imprisonment without the possibility of parole plus eight years.  On appeal, the defendant contends the evidence presented at trial was insufficient to support his convictions.  The defendant also argues the trial court erred in denying his motion for severance and in admitting autopsy photographs of the victim, the testimony of Sergeant Harry Harper, and video testimony of the victim.  After reviewing the record and considering the applicable law, we conclude that the trial court erred in failing to sever the offenses and that the error was not harmless as to the defendant's convictions for aggravated assault and false imprisonment.  Accordingly, we reverse the defendant's convictions for aggravated assault and false imprisonment and remand to the trial court for a new trial.  We otherwise affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

James A. Simmons and Jamie Tarkington, Hendersonville, Tennessee, for the appellant, Corey Denzal Williams.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Ray Whitley, District Attorney General; Jenni Smith and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### Facts and Procedural History

This case relates to the March 23, 2018 assault and April 3, 2018 shooting death of the victim, Lexus Williams. For his actions, the defendant was charged with first-degree murder (count one), reckless endangerment (count two), aggravated assault (count three), and false imprisonment (count 4). The defendant subsequently filed a motion to sever the charges related to the March 23rd incident, counts three and four, from the charges related to the April 3rd incident, counts one and two. The trial court conducted a pre-trial hearing on July 8, 2019.

### I.    Motion for Severance

In his motion for severance, the defendant argued there was no common scheme or plan connecting the two incidents; the victims in count three were different from the victim in counts one, two, and four; and evidence regarding counts one and two would not be admissible against counts three and four. The State argued the offenses should remain mandatorily joined as they constitute a single criminal episode, or in the alternative, that the offenses form a common scheme or plan and the evidence of one offense would be admissible in the trial of the other.

Investigator Katie Hope[1] with the Gallatin Police Department ("GPD") testified that on March 21, 2018, an employee from the Gallatin Day Care notified the GPD of their concerns regarding the defendant and the victim, the defendant's wife. Investigator Hope was advised that the defendant displayed controlling behavior towards the victim, leading the employees to fear for the victim's life. Investigator Hope met with the victim at the apartment she shared with the defendant and their two children, three-year-old W.W. and two-year-old I.W.[2] During their twenty-minute conversation, Investigator Hope provided the victim with resources for domestic violence victims, and the victim "seemed accepting of the advice." The victim advised Investigator Hope that she planned to leave the defendant and take the children to her mother's house. Before leaving, Investigator Hope cautioned the victim that the "moment when you're trying to leave is one of the most dangerous moments for a domestic violence victim."

On March 23, 2018, Investigator Hope was again contacted by the Gallatin Day Care after W.W. advised an employee that "Daddy was beating up on Mommy." Investigator Hope spoke to the victim, who stated that she placed a password on her phone to prevent the defendant from viewing her plans for escape. When the defendant

---

[1] Investigator Hope is also referred to as Katie Kittrell throughout the record.

[2] It is the policy of this Court to refer to minors by their initials.

discovered the password, he began screaming and demanded that the victim unlock her phone.  When the victim refused, the defendant pulled a gun from behind their bed and prevented her from leaving the bedroom.  The victim told Investigator Hope that "she saw the rage in [the defendant's] eyes, and she thought he was going to kill her."  W.W. and I.W. were on the staircase outside of the bedroom during the altercation.  Investigator Hope arrested the defendant for aggravated assault and false imprisonment and searched the apartment for the weapon used during the incident but did not locate it.  As a result of the defendant's arrest, an order of protection was taken out against him, and he was scheduled to appear in court on April 4, 2018.

Investigator Emily Stockdale with the GPD testified that she responded to a shooting call on April 3, 2018.  When she arrived at the scene, the victim, who was shot in her head, hand, and abdomen, had already been transported to the hospital and pronounced dead.  Investigator Stockdale observed the victim's vehicle in the middle of the street with the driver's side window shattered.  The children, who were in the back seat at the time of the shooting, had been taken into a nearby home.  Upon reviewing video surveillance footage from a nearby residence, Investigator Stockdale observed the victim's vehicle driving down the street before the driver's side window shattered and the vehicle came to a stop.  A person then exited from the front passenger door and ran into the neighborhood.  Because the vehicle was still running, it began rolling down the street with the victim's children inside before nearby residents rushed to the vehicle to stop it.  Investigator Stockdale also viewed a nearby trail camera that picked up the same suspect, who was wearing black boots, a black belt, khaki pants, a dark jacket, and a toboggan, running through the area.  A short time later, the defendant was apprehended while hiding under a porch several blocks away from the crime scene.  He did not have a shirt on at the time of his arrest but was wearing khaki pants, a black belt, and black boots.  During W.W.'s forensic examination, she disclosed that "Daddy [shot] Mommy."

At the conclusion of the hearing, the trial court entered a written order denying the defendant's motion for severance, making the following findings:

> This was a permissive joinder, and the State must show that the offenses constitute parts of a common scheme or plan and they are of the same or similar character.

> The [c]ourt finds that there was a marriage, children, a weapon, and abuse.  The situation went from one extreme to another where a trigger is not pulled to where a trigger is pulled four or five times.  There were the same witnesses to both.

The incidents are not signature crimes and are not part of the same transaction.

The [c]ourt finds a common scheme or plan in that [the defendant] demeaned the victim, abused the victim, and exercised control over the victim. It continues to go to the extreme, resulting in a homicide. There was a court date scheduled for April 4, 2018, where everyone was going to show up.

The [c]ourt finds that one could not start the homicide case without showing the relationship was stagnant and dysfunctional.

The court date of April 4, 2018, where [the defendant and the victim] were supposed to appear, shows motive, intent and the extreme to which [the defendant] went in the relationship. It shows the background, identity, guilty knowledge, absence of mistake, and so forth. These are material points that would make one admissible in the trial of the other.

The [c]ourt finds that the prejudicial effect of this evidence does not outweigh the probative value. The inclusion of both incidents logically results in the fact that [the defendant] might have a propensity to commit crimes. It is extremely probative because it shows the decaying of the relationship and explains their lives.

The [c]ourt finds that based on the fact that [the defendant] pulled a weapon, threatened [the victim], that the same weapon was used, and that the two witnesses are the same, in addition to the fact that [the victim] was afraid for her life and that the court date regarding the first case was the day before [the victim] was murder[ed], the motion to sever offenses is denied.

The defendant then proceeded to trial.

II.    *Trial*

The evidence presented at trial showed that in March 2018, Linda Lou Boyers, the executive director of the Gallatin Day Care, became increasingly concerned about the victim's welfare. Ms. Boyers, who had known the victim since she was a child, observed the victim with multiple injuries when she dropped off W.W. and I.W. at the day care, including a broken arm and the "tips of her fingers [] cut off by a car door." When Ms. Boyers asked the victim about these injuries, she stated that they were accidents. Although the victim implored Ms. Boyers not to report her concerns to the police, Ms. Boyers

contacted them near the end of March after W.W.'s teachers came to her with additional concerns.

Investigator Katie Hope, previously with the GPD, spoke with employees at the Gallatin Day Care on March 21, 2018, regarding their concerns of domestic violence between the defendant and the victim. Investigator Hope met with the victim and asked her if she felt safe or if there was anything she wanted to report. The victim declined to make a report at that time, and Investigator Hope gave the victim her phone number as well as information regarding Home Safe, a domestic violence shelter in Gallatin. On March 23, 2018, workers at the day care again contacted police regarding concerning statements made by the victim's children, and Investigator Hope met with the victim, who disclosed that "she thought that [the defendant] was going to kill her the night before." The victim told Investigator Hope that she installed a password on her phone to prevent the defendant from discovering her plans to leave the marriage. On the previous evening, the defendant discovered the password and demanded the victim unlock her phone. When the victim refused, the defendant threw the phone across the room and retrieved a "long, black gun" from behind their bed. The defendant threatened the victim with the weapon, stating that "she wasn't going to leave, and he didn't want to do this anymore." The victim began praying, and the defendant told the victim that "prayers weren't going to help her." Eventually the defendant left the bedroom, and the victim was able to escape. Based on this information, Investigator Hope obtained a warrant for the defendant's arrest.

Sergeant Harry Harper, a station commander with the United States Army Recruiting Command, was working at the recruiting station in Gallatin on April 2, 2018, when the defendant entered the office. Sergeant Harper had encountered the defendant three times prior to this date. A year earlier the defendant and his father offered to cut down a tree in Sergeant Harper's yard. A few months later, Sergeant Harper saw the defendant at a nearby Walmart and invited the defendant to come to the recruiting station. The defendant later went to the recruiting station, took a practice test, and received additional information. When the defendant entered the recruiting station on April 2nd, he appeared "very agitated, seemed very short," which was a drastic change from the previous times Sergeant Harper had interacted with the defendant. The defendant disclosed that he had a pending domestic violence charge against him and explained that the victim was upset at the defendant for having multiple affairs and had called the police in retaliation. However, the defendant assured Sergeant Harper that "they were working on that in order to get rid of the charges." Sergeant Harper told the defendant that a domestic violence charge would disqualify the defendant from serving in the military and that he needed to get the charge dismissed if he wanted to continue his recruitment.

On April 3, 2018, the victim left work at 4:54 p.m. and visited her sister, Mariah Bush, who was not feeling well. She then went to Triple Creek Park for a parent meeting

for W.W.'s softball team. There, the victim spoke with her other sister, Miranda Banks, whose child was also on the softball team. The victim, who was alone at the time, left the park at 6:36 p.m. to pick up her children from the defendant.

At 6:50 p.m., Tabithia Graves and her husband were watching television in their home on Buffalo Ridge when she heard several "pop[s]." As Ms. Graves went into her garage to investigate, the defendant walked past her wearing a heavy coat, utility pants, and a toboggan. Ms. Graves called out to the defendant, but he ran into her backyard and jumped over her fence. Ms. Graves turned back towards the front of her house and noticed a vehicle slowly rolling down the street with two small children in the back seat. Ms. Graves told her husband to call 911 and walked towards the vehicle, where she observed the victim in the driver's seat with her head against the steering wheel. Ms. Graves and another neighbor opened the driver's door, put the vehicle in park, and placed the victim onto the pavement. Ms. Graves could see "brain matter sitting on top of [the victim's] head" but performed chest compressions on the victim until police arrived.

After the victim was removed from the vehicle, a neighbor took the victim's children into a nearby house. Gracie Hiett, who lived across the street with her parents and brother, watched over W.W. and I.W. while her parents assisted Ms. Graves. The children were "hysterical," and I.W. repeatedly stated that his "daddy went bang, bang, bang."

W.W., who was eight years old at the time of trial, testified that her mother was driving to her paternal grandmother's house at the time of the shooting. The defendant was in the passenger seat, and W.W. and I.W. were in the back seat. The defendant and the victim began arguing, and the defendant shot the victim. Although W.W. did not see the defendant holding a gun, she heard the gunshots as the defendant shot the victim. Following the shooting, the defendant got out of the vehicle, leaving the children in the back seat.

Officer Cameron Ferrell, previously with the GPD, responded to a shots fired call and arrived at the scene to find a vehicle stopped in the middle of road with the driver's door open. Beside the vehicle, the victim was lying on the street, suffering from several apparent gunshot wounds. Officer Ferrell took over chest compressions from Ms. Graves and continued until paramedics arrived.

Suzanne Barnett, who lived several blocks away from where the shooting occurred, was sitting on her back porch with her daughter when she became aware that the police were searching for someone in her neighborhood. Ms. Barnett went inside and told her family to turn off the lights so no one could see that they were home. As she looked out of her bedroom window, she saw the defendant walk past her and into her backyard. Ms. Barnett went to the kitchen window and observed the defendant attempt to enter her truck

and guest house. Ms. Barnett then told a family member to call 911 as the defendant climbed under the steps of her back porch and hid.

Officer Darren Rager, previously with the GPD, received information that the defendant had been spotted running in a backyard off Hartsville Pike and proceeded to that location. As he neared the residence, Officer Rager heard a woman shout that the defendant was under her porch. Law enforcement officers surrounded the porch and took the defendant, who was shirtless and wearing khaki pants and boots, into custody. The following morning, Officer Rager and several other officers inspected the residential trash cans between the location of the shooting and the residence where the defendant was located. During his search, Officer Rager collected a black jacket, black vest, and tan toboggan.

Officer James Kemp with the GPD assisted with the search for evidence on the morning following the shooting. While inspecting a field behind Morningside Nursing Home, Officer Kemp noticed a manhole cover with a large hole next to it. Inside the hole, Officer Kemp recovered a white tank top, a white t-shirt, and a light blue t-shirt "all wadded together like whoever had them on took them off all at once and just threw them in the hole."

Officer Brandon Troutt, previously with the GPD, obtained surveillance video footage from the Hiett residence which showed the victim's vehicle driving down Buffalo Ridge, the driver's side window shattering, and the defendant exiting the vehicle and running towards the Graves residence.

Dr. Emily Dennison, an expert in anatomic and forensic pathology with the Davidson County Medical Examiner's Office, performed the autopsy on the victim. Dr. Dennison testified the victim suffered five gunshot wounds. The first bullet was to the right side of her scalp and travelled through the victim's brain before lodging in her left eye. The second bullet entered the right side of the victim's face and exited through the top of her head. The third bullet entered behind the right ear and travelled through her skull and brain before lodging in the back of her scalp. The fourth bullet entered her upper right abdomen, passed through her ribs and intestines, and exited her back left torso. The fifth bullet entered and exited her right hand. The gunshot wound to the victim's face contained stippling and soot, indicating the victim was within twelve inches of the gun at the time she was shot. The abdomen wound contained only soot, and Dr. Dennison opined this was a contact gunshot wound. The gunshot wound to her hand had extensive stippling, indicating the gun was fired within one to three feet from the victim. Dr. Dennison also observed a crescent-shaped laceration above the victim's right eyebrow. Dr. Dennison recovered two projectiles and several bullet fragments from the victim's wounds.

Special Agent Lindsey Anderson, a microanalysis expert with the Tennessee Bureau of Investigation ("TBI"), analyzed several pieces of data found at the crime scene, including the defendant's gunshot residue kit, khaki pants, boots, a jacket, a vest, a white t-shirt, a mask, and a glove. Agent Anderson found the presence of gunshot residue on the jacket and vest. Gunshot residue was not detected on the defendant's gunshot residue kit, the khaki pants, or the boots. The white t-shirt, mask, and glove were not tested following the positive result on the jacket and vest.

Special Agent Jessica Hudson, a firearms and tool mark identification expert with the TBI, processed the victim's vehicle. Agent Hudson discovered four bullet holes in the vehicle: one on the outside of the driver's side door, one on the inside of the driver's side door, and two in the driver's seat. Agent Hudson also recovered a bullet on the floorboard between the driver's seat and the inside of the driver's side door panel. Additionally, the glass of the driver's side window was shattered.

The defendant called Leslie Williams, D'Marquise Johnson, and Joyce Williams as witnesses. Leslie Williams, the defendant's mother, testified the defendant owned a landscaping and tree disposal business, and he often wore multiple layers of clothing to protect himself while using a chain saw. Ms. Williams testified that the defendant was living at her house following his arrest for assaulting the victim. However, she stated that the defendant and the victim spent time together in the week prior to the shooting, and Ms. Williams did not observe any arguments between them. On cross-examination, Ms. Williams admitted that she knew the defendant owned guns and kept them in the apartment he shared with the victim and their children.

D'Marquise Johnson testified that he assisted the defendant with his landscaping business and stated that their typical attire was thick layers of clothing, including boots, pants, and shirts.

Joyce Williams,[3] the defendant's grandmother, testified that on April 3, 2018, she was working at Oh Taste and See restaurant when the defendant drove up to the back door. Joyce went outside to speak with him and noticed the defendant was wearing "heavy clothes" and had "some stuff in his hair where he had been cutting trees." The defendant, who did not appear upset, told his grandmother that he was going to pick up W.W. and I.W. from day care.

Stipulations of fact were entered into proof which stated the following:

---

[3] Because Leslie Williams and Joyce Williams share the same last name, we will refer to Joyce by her first name. We intend no disrespect.

On April 6, 2018, [a] trail camera located in the side yard of the residence . . . owned by Shirley Peeler captured three images at 19:12 or 7:12 p.m. of the back of an individual. The individual was running through the side yard. The three images captured were retrieved by officers with the Gallatin Police Department.

On April 3, 2018, at 20:03, which is 8:03 p.m., the defendant, Corey Williams, was taken into custody by members of the Gallatin Police Department at the residence located at . . . Hartsville Pike. Corey Williams was located and arrested without incident under the back porch of the home. The body camera footage from Officer Justin Cummins is an accurate reflection of these events.

On April 3, 2018, at approximately 20:03 or 8:03 p.m., Investigator Charlie Belote with the Gallatin Police Department assisted other officers in the arrest of the defendant, Corey Williams, [and] subsequently collected clothing worn by Corey Williams at the time of his arrest. Corey Williams did not have a shirt on at the time of arrest but Investigator Belote collected two pairs of pants, a belt, and boots that were worn by Corey Williams. Investigator Belote collected gunshot residue swabs from the defendant, Corey Williams' hands. These items were submitted and logged into evidence at the Gallatin Police Department.

Following deliberations, the jury found the defendant guilty of first-degree murder (count one), reckless endangerment (count two), aggravated assault (count three), and false imprisonment (count four). Following a bifurcated hearing, the jury imposed a sentence of life imprisonment without the possibility of parole for the first-degree murder conviction. The trial court subsequently imposed sentences of two years for count two, six years for count three, and eleven months, twenty-nine days for count four. The trial court ordered counts three and four to be served concurrently with each other but consecutive to counts one and two, for an effective sentence of life imprisonment without the possibility of parole plus eight years.

The defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

### *Analysis*

On appeal, the defendant contends the evidence presented at trial was insufficient to support his convictions. The defendant also argues the trial court erred in denying his motion for severance, in allowing the introduction of autopsy photographs of the victim, in

admitting the testimony of Sergeant Harry Harper, and in admitting video testimony of the victim. The State contends that the evidence is sufficient and that the trial court properly denied the motion for severance and admitted the autopsy photographs. The State also contends that review of the admittance of Sergeant Harper's testimony has been waived.

## I. Denial of Motion for Severance[4]

The defendant argues the trial court erred in denying his motion for severance. The defendant contends there was no common scheme or plan connecting the March and April offenses. The State submits the trial court acted within its discretion in denying the motion for severance. We conclude the trial court erred and that the error was not harmless as to the defendant's convictions for aggravated assault and false imprisonment. Therefore, those convictions must be reversed and the case remanded to the trial court for a new trial on those charges.

Two or more offenses may be joined in the same indictment if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character. Tenn. R. Crim. P. 8(b)(1), (2). However, "the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1). A trial court's decision to consolidate or sever offenses pursuant to Rule 8(b) and Rule 14(b)(1) is reviewed for an abuse of discretion. *State v. Eady*, 685 S.W.3d 689, 709 (Tenn. 2024). "An abuse of discretion in this context implies that the trial court applied an incorrect legal standard or reached a decision against logic or reasoning which caused an injustice to the complaining party." *State v. Denton*, 149 S.W.3d 1, 12 (Tenn. 2004). A defendant has the burden of showing that he was "clearly prejudiced" by the trial court's denial of a motion to sever the offenses. *State v. Hall*, 976 S.W.2d 121, 146 (Tenn. 1998).

In examining a trial court's ruling on a severance motion, the primary consideration is whether the evidence of one offense would be admissible in the trial of another if the offenses remained severed. *Spicer v. State*, 12 S.W.3d 438, 445 (Tenn. 2000). Essentially, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" *Id.* (quoting *State v. Moore*, 6 S.W.3d 235, 239 (Tenn. 1999)). As such, the trial court must determine from the evidence presented that

> (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of [one] offense is relevant to some material issue in the trial of all

---

[4] For the sake of clarity, we have reordered and renumbered the issues from the order they appear in the defendant's brief.

the other offenses; and (3) the probative value of the evidence is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

*State v. Garrett*, 331 S.W.3d 392, 403 (Tenn. 2011) (quoting *Spicer*, 12 S.W.3d 438, 445 (Tenn. 2000)) (citations omitted).

Our supreme court has recognized that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." *Moore*, 6 S.W.3d at 240 n.7. Common scheme or plan evidence tends to fall into one of three categories:

(1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction.

*Id.* at 240. A larger, continuing plan or conspiracy relates to "crimes committed in furtherance of a plan that has a readily distinguishable goal, not simply a string of similar offenses." *Denton*, 149 S.W.3d at 15. This category "encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). The evidence sought is "of a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial." *State v. Massey*, No. E2013-01047-CCA-R3-CD, 2014 WL 3661490, at *31 (Tenn. Crim. App. July 23, 2014) (quoting *State v. Harris*, No. M2004-00049-CCA-R3-CD, 2005 WL 2255488, at *7 (Tenn. Crim. App. Aug. 23, 2005). Where the State has not established evidence of a "'working plan' whereby the subsequent offenses are predictable or probable from the defendant's determination to commit the initial offenses (or vice versa)," the subsequent offenses cannot constitute parts of a larger, continuing plan. *Id.*

The evidence at the motion for severance hearing established that employees at the victim's children's day care contacted police after becoming increasingly concerned for the victim's welfare. Investigator Hope spoke with the victim, who stated that she planned to leave the defendant. Two days later, the victim's daughter told a day care employee that "Daddy was beating up on Mommy," and the victim reported that the defendant threatened the victim with a gun after finding a password on the victim's phone. According to Investigator Hope, the victim stated that she thought the defendant was going to kill her during the altercation and that the victim's children were in the home but outside of the room where the defendant threatened the victim. The defendant was subsequently arrested for assaulting the victim, and a court date was set for two weeks later. The day before the defendant's court date, while riding in the passenger seat of the victim's vehicle, the

defendant shot the victim multiple times while she was driving. The defendant then got out of the moving vehicle and hid at a nearby residence, leaving his small children, who witnessed their mother's murder, in the back seat. In denying the defendant's severance motion, the trial court found that the offenses were part of a common scheme or plan to "demean[] the victim, abuse[] the victim, and exercise[] control over the victim." The trial court noted that in both incidents "[the defendant] pulled a weapon, threatened [the victim], that the same weapon was used, and that the two witnesses are the same." We conclude the defendant's domestic violence towards the victim and her death during their final altercation were part and parcel of his continuing plan to subdue the victim to prevent her from leaving him, and that this satisfies the requirement of a "common goal or purpose." *Denton*, 149 S.W.3d at 15.

We now turn to the question of whether the evidence of one crime would be admissible in the trial of the others. Tenn. R. Crim. P. 14(b)(1). "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). This is to prevent the jury from convicting the defendant of a crime based on propensity rather than proof of guilt of a specific offense. *Garrett*, 331 S.W.3d at 402 (citing *Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)). "Accordingly, any doubt about the propriety of the consolidation of similar offenses over a defendant's objection should be resolved in favor of the defendant." *Id.* at 403. However, Rule 404(b) permits evidence when offered to prove some issue other than character or propensity relevant to trial. *Moore*, 6 S.W.3d at 239. Material issues on which 404(b) evidence may bear include: "(1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation." *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004); *State v. Gilliland*, 22 S.W.3d 266, 271 n.6 (Tenn. 2000). If the offenses sought to be severed are not relevant to prove a material issue in conformity with Rule 404(b), then severance should be granted. *See State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003).

The trial court found that

[t]he court date of April 4, 2018, where [the defendant and the victim] were supposed to appear, shows motive, intent and the extreme to which [the defendant] went in the relationship. It shows the background, identity, guilty knowledge, absence of mistake, and so forth. These are material points that would make one admissible in the trial of the other.

Although we agree with the trial court that the events from the March 23, 2018 assault and false imprisonment would be admissible in the trial of the April 3, 2018 murder to show motive, we disagree that evidence of the murder would be admissible at the assault trial.

- 12 -

Identity was not an issue in either offense, evidence of the murder would not prove motive for the assault, and nothing was raised at trial that required rebuttal of an accident or mistake. There are no issues apparent in the record that would have necessitated proof from the murder to establish the aggravated assault and false imprisonment, and we do not find that the evidence is admissible to establish another relevant issue. Accordingly, the trial court did not abuse its discretion in denying the defendant's motion for severance.

When reviewing a trial court's erroneous consolidation of offenses, the appellate court "must determine whether the trial court's error 'more probably than not affected the judgment.'" *Garrett*, 331 S.W.3d at 405 (quoting *Toliver*, 117 S.W.3d at 231). The line between harmless error and prejudicial error is directly proportional to the degree by which the evidence exceeds the standard required for conviction. *Id.* at 405. "'The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome on its merits.'" *Dotson*, 254 S.W.3d at 388 (quoting *Toliver*, 117 S.W.3d at 231). However, this Court must focus not only on the weight of the evidence, but on "'the actual basis of the jury's verdict.'" *Garrett*, 331 S.W.3d at 405 (quoting *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008)). Thus, "[t]he key question is whether the error likely had an injurious effect on the jury's decision-making process. If the answer is yes, the error cannot be harmless." *Dotson*, 254 S.W.3d at 389.

While the evidence was sufficient to support the defendant's convictions for aggravated assault and false imprisonment, the proof was not overwhelming and primarily consisted of circumstantial evidence. In contrast, the evidence supporting the convictions for first-degree murder and reckless endangerment was overwhelming and included the testimony of several witnesses as well as physical evidence.

Regarding the offenses on April 3, 2018, surveillance footage showed the victim's vehicle driving down the road, the driver's window shattering, and the defendant exiting the vehicle from the passenger door, leaving his young children in the back seat. The defendant was later arrested while hiding underneath the porch of a nearby residence. Clothing matching that worn by the defendant in the surveillance footage was found in various places along the route from the victim's vehicle to the residence where the defendant was apprehended. A jacket and vest worn by the defendant in the surveillance footage tested positive for gunshot residue. The defendant's daughter, who was in the vehicle at the time of the shooting, testified that the defendant and the victim were arguing before the defendant shot the victim multiple times. We, therefore, conclude that the proof supporting the first-degree murder and reckless endangerment convictions is sufficiently strong such that the jury likely would have convicted the defendant of these convictions even had it not heard any evidence about the assault of the victim on March 23, 2018.

However, the proof supporting the aggravated assault and false imprisonment convictions consisted of the testimony of Ms. Boyers from the children's day care, who testified that she was concerned about the victim following statements made by the victim's children. Investigator Hope spoke with the victim following the day care's report and was told that the defendant had threatened the victim with a gun. The trial court's failure to sever the offenses allowed the State to bolster its proof of the aggravated assault and false imprisonment charges with evidence that two weeks after threatening to kill the victim the defendant shot the victim in front of their children. Under these circumstances, we conclude that the erroneous failure to sever the offenses more probably than not affected the verdict on the charges of aggravated assault and false imprisonment. *See* Tenn. R. App. P. 36(b); *Dotson*, 254 S.W.3d at 390. Therefore, because the error cannot be classified as harmless, we reverse the defendant's convictions for aggravated assault and false imprisonment and remand the case for a new trial on these charges. Nevertheless, in the event of further appellate review, we will address the defendant's remaining issues as to all four counts.

## II.    Sufficiency[5]

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

---

[5] Although the defendant contends the evidence was insufficient "to support the findings by the trier of fact for a conviction of [f]irst-[d]egree [m]urder, [a]ggravated [a]ssault, [r]eckless [e]ndangerment, and [f]alse [i]mprisonment," the argument section of his brief contains no mention of his convictions for aggravated assault, reckless endangerment, or false imprisonment and no rationale as to why they should be reversed. Therefore, any claim that the evidence is insufficient to support the defendant's aggravated assault, reckless endangerment, and false imprisonment convictions is waived. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7).

- 14 -

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of one count of first-degree premeditated murder. First-degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of

premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

Here, the defendant does not dispute that he shot the victim. Instead, the defendant argues the State failed to establish that he acted with premeditation. Specifically, the defendant contends that the short period of time between the victim leaving Triple Creek Park and the shooting in her vehicle, the defendant's demeanor when visiting his grandmother on the day of the shooting, and Ms. Williams' testimony that the defendant and the victim were not arguing in the days prior to the murder "do not support the jury['s] verdict that [the defendant] exercised 'reflection and judgment' on the afternoon of April 3, 2018." The State contends the evidence was sufficient to support the jury's determination, and we agree.

In the light most favorable to the State, the evidence shows that the victim was driving the defendant and their children to the defendant's mother's house when she and the defendant began arguing. The defendant, who was living separately from the victim and children following a prior altercation and the entry of an order of protection, pulled out a gun and shot the victim five times. The defendant exited the vehicle, leaving his young children in the back seat, and ran through the surrounding neighborhood before hiding under the porch of a nearby residence.

Looking specifically to the premeditation factors outlined by our supreme court, the record establishes the defendant shot the unarmed victim while she was driving her vehicle with their two children in the backseat. The defendant shot the victim five times, including three times in the head. Afterward, he did not attempt to render aid to the victim, choosing instead to exit the moving vehicle, dispose of his clothing and the gun, and hide under a nearby porch. Two weeks prior to the shooting, the defendant was arrested for assaulting and threatening the victim with a gun, and when the defendant spoke with Sergeant Harper about joining the army on the day before the shooting, Sergeant Harper informed the defendant that he would be ineligible to enlist in the Army with a pending domestic violence charge. *See Bland*, 958 S.W.2d at 660; *Larkin* 443 S.W.3d 815-6. Accordingly, the record is sufficient to establish premeditation so as to sustain a conviction for first-degree murder. The defendant is not entitled to relief on this issue.

## III.    Autopsy Photographs

The defendant argues the trial court erred in admitting gruesome autopsy photographs of the victim. The defendant argues that, because he did not dispute that he shot the victim, the purpose of the photographs was to inflame the jury. The State contends the trial court properly exercised its discretion in admitting the photographs.

The trial court retains "discretion regarding the admissibility of photographs, and a ruling on this issue 'will not be overturned on appeal except upon a clear showing of abuse of discretion.'" *State v. Pruitt*, 415 S.W.3d 180, 239 (Tenn. 2013) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)). To be admissible, a photograph "must be 'verified and authenticated by a witness with knowledge of the facts'" and it "must be relevant to an issue that the jury must determine." *Id.* (citations omitted). Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence, including photographs, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice refers to evidence with "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" *Pruitt*, 415 S.W.3d at 239 (quoting *Banks*, 564 S.W.2d at 951). "Photographs must never be used 'solely to inflame the jury and prejudice them against the defendant.'" *Id.* (quoting *Banks*, 564 S.W.2d at 951).

Prior to admitting the autopsy photographs of the victim, the trial court carefully considered each photograph's relevancy and potential prejudicial effect. Additionally, the trial court excluded several photographs as being repetitious. Though it was undisputed the victim died from multiple gunshot wounds, the State was still required to prove the defendant shot and killed her. The photographs, which depicted the entrance and exit wounds suffered by the victim, aided in this effort and were relevant to the State's case. Additionally, the photographs admitted were not particularly gruesome or inflammatory. Nothing in the record suggests the trial court abused its discretion in admitting the autopsy photographs into evidence. *Pruitt*, 415 S.W.3d at 239. The defendant is not entitled to relief on this issue.

## IV.    Testimony of Sergeant Harry Harper

The defendant asserts the trial court erred in admitting the testimony of Sergeant Harry Harper. The State contends the defendant has waived this issue for failing to make any argument as to how the trial court erred in admitting Sergeant Harper's testimony. Upon our review of the record, we agree with the State.

In the defendant's brief, after reciting the facts of the jury-out hearing regarding Sergeant Harper's testimony, the defendant asserts "[t]he [c]ourt abused its discretion in admitting this testimony." In his reply brief, the defendant added only that the testimony should have been excluded because it "confused the issue as to motive and premeditation" and "it was illogical that enlisting in the Army was the motive." However, the defendant

failed to support this skeletal argument with any citation to authorities. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. Of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Accordingly, the defendant's argument has been waived, and he is not entitled to relief on this issue.

## V.      Video Testimony of the Victim

In his reply brief, the defendant for the first time on appeal argues the trial court erred in admitting video testimony of the victim under Tennessee Rule of Evidence 404(b). Because the defendant failed to include this issue in his motion for new trial, he requests review under the plain error doctrine. However, the defendant simply asserts that "[t]he video testimony affected the result of the trial." Additionally, the defendant made no attempt to argue how the plain error doctrine applies, stating only that "[e]ach of the elements are present in this case." We again note that "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed*, 301 S.W.3d at 615. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived by this court." Tenn. Crim. App. R. 10(b). Accordingly, the defendant's argument has been waived, and he is not entitled to relief on this issue.

## VI.     Cumulative Error

Finally, the defendant contends that even if no single error requires a new trial, the cumulative effect of these errors mandates such action. The State responds that, because the defendant has failed to show that the trial court committed any errors, the cumulative error doctrine should not apply.

The cumulative error doctrine applies when multiple errors were committed during trial, each of which alone would have constituted harmless error, but in the aggregate have a cumulative effect on the proceedings so great the defendant's right to a fair trial can only be preserved through reversal. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Circumstances warranting reversal of a conviction under the cumulative error doctrine "remain rare." *Id.* Because we have only found one error in this case, the cumulative error doctrine is inapplicable. Nevertheless, we have determined that the single error entitles the

defendant to reversal of his convictions for aggravated assault and false imprisonment and remand for a new trial on those charges.

### *Conclusion*

For the aforementioned reasons, the judgments of the trial court are affirmed with respect to the defendant's convictions for first-degree murder and reckless endangerment. The defendant's convictions for aggravated assault and false imprisonment are reversed and remanded for a new trial.

_____

J. ROSS DYER, JUDGE